UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

TERRITA STENNIS,

        Plaintiff,

    v.

WILLIAM ARMSTRONG, et al.,

        Defendants.

No. 18 CV 7846

Judge Manish S. Shah

**MEMORANDUM OPINION AND ORDER**

Plaintiff Territa Stennis was issued parking tickets by police officers assigned to the Edward Hines Jr. Veterans Administration Hospital. Stennis—who filed for bankruptcy around the same time—didn't pay the tickets or appear in court as required. A federal judge issued a warrant for her arrest. Hines police officers arrested Stennis and double-handcuffed her behind her back, possibly injuring Stennis's chest. While Stennis complained of pain, told the officers that she had had breast cancer and surgery, said the handcuffs were hurting her breast implant, and said that she had torn something, the officers didn't seek medical care for Stennis during the course of an hour-long drive. Stennis sues the arresting officers under *Bivens* for excessive force and for failing to provide medical care. Plaintiff brings four Federal Tort Claims Act claims against the United States. Defendants move for summary judgment. For the reasons explained below, the motion is granted in part and denied in part.

## I.    Legal Standards

Summary judgment is appropriate when the movants show that there is no genuine dispute as to any material fact and that they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if the evidence is such that a jury could return a verdict for the nonmoving party. *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012). I construe all facts and draw all inferences in favor of plaintiff, the nonmoving party. *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 794 (7th Cir. 2013). I need only consider the cited materials, but I may consider "other materials in the record." Fed. R. Civ. P. 56(c)(3).

## II.   Facts

Territa Stennis worked at the Hines VA Hospital beginning in 2003. [90] ¶ 1; *see* [80-1] at 11.[1] In 2014, she began working for the education department at Hines. [90] ¶ 1. As an education program assistant, Stennis processed reimbursement requests for employees, including the hospital's police officers. *Id.* ¶ 3.

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except in the case of citations to depositions, which use the deposition transcript's original page number. The facts are largely taken from plaintiff's response to defendants' joint Local Rule 56.1 statement, [85], and defendants' response to plaintiff's statement of additional facts, [90], where both the asserted fact and the opposing party's response are set forth in one document. Any fact not properly controverted is admitted. N.D. Ill. Local R. 56.1(e)(3); *see Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009); *see, e.g.*, [85] ¶¶ 3, 8, 18, 21, 24; [90] ¶¶ 5–6, 31, 33. I disregard legal arguments in the statements of facts, *see Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006), and ignore additional facts included in response that do not controvert the asserted fact. N.D. Ill. Local R. 56.1(e)(2); *see, e.g.*, [85] ¶¶ 3, 5–6, 8, 18, 21, 23–24; [90] ¶¶ 5, 28, 31, 33.

In 2010, Stennis was diagnosed with cancer, requiring chemotherapy and surgical treatment. [90] ¶ 2. A year later, Stennis had a bilateral mastectomy. *Id.* ¶¶ 2, 9. She had a further procedure in 2012 to implant tissue expanders, and two years later Stennis had surgery to exchange her breast implants. *Id.* ¶ 2.

Hines had its own police department. [85] ¶ 1. There's a dispute about the history between Stennis and one of the department's officers, defendant William Armstrong. *See* [90] ¶ 4. According to Stennis, at some point before her arrest (discussed below), Armstrong asked Stennis to engage in fraud or theft. *Id.*; *see* [80-1] at 116–18, 131–33; [85-2] at 32–33. But Armstrong said that he first spoke with Stennis when she was arrested. *See* [80-3] at 49–51, 124.

Hines police officers patrolled the hospital campus parking lots, and issued parking citations. [85] ¶ 1. Between November 2014 and July 2015, Stennis was issued three citations. *Id.* ¶ 2; *see* [80-5]; [80-6]; [80-7]. The tickets required Stennis to either pay a fine or appear in court. *See* [80-5]; [80-6]; [80-7]. On July 16, 2015, a related summons was issued, ordering Stennis to appear in federal court on September 15, 2015. [85] ¶ 2;[2] [80-8].

Stennis sent an email to Officer Armstrong, asking that he avoid contacting her supervisor about the parking tickets. [85] ¶ 3; [80-9] at 1. Stennis wrote that she had twice come to the police station to discuss the matter and had talked about it with another officer. [85] ¶ 3; [80-9] at 1. Stennis told Armstrong that she had filed

---

[2] There's an immaterial dispute as to whether Stennis responded to the tickets. *See* [85] ¶ 2. That a summons was issued shows that Stennis failed to respond as required by the citations. Stennis communicated with Officer Armstrong about the tickets. *See id.*; [80-1] at 28–30, 35.

for bankruptcy, that all of the parking tickets should have been covered by that proceeding, instructed Armstrong to contact her lawyer, and directed that related documents be mailed to a P.O. box. [85] ¶ 3; [80-9].

In March and April 2016, Stennis was issued four more parking citations at the hospital. [85] ¶ 4; [80-10]; [80-11]; [80-12]; [80-13]. Stennis failed to respond to the citations as required, and on May 18 a federal court issued a second summons, ordering Stennis to appear on July 11, 2016. *See* [85] ¶ 6; [80-15]. Armstrong mailed the summons to Stennis's P.O. box. *See* [85] ¶ 5; [80-3] at 46–48.[3]

Armstrong also emailed Stennis about her parking tickets. [90] ¶ 5. Stennis asked her bankruptcy attorney to speak to the chief of the Hines police department, because she believed that Armstrong and the chief were acting in retaliation for her refusal to commit fraud with Armstrong. *See id.*; [80-1] at 29–30. Despite the fact that Armstrong worked nearby, he never came to Stennis's office to inform her of a pending court date. [90] ¶ 6. When Stennis attempted to find Armstrong at the Hines police station, he was unavailable. *Id.*

In June, Stennis's bankruptcy attorney sent an email to the Hines police department and the federal prosecutor assigned to Stennis's case. [85] ¶ 7; [80-16]. The attorney wrote that Stennis had filed for bankruptcy in August 2015, and that

---

[3] Neither of the records cited by defendants—Armstrong's deposition testimony and mail receipts—show that Armstrong sent copies of the citations themselves to Stennis. *See* [85] ¶ 5; [80-3] at 46–48; [80-14]. Armstrong's deposition testimony was that he sent documents—including the second summons—to Stennis's P.O. box as she had requested. *See* [80-3] at 46–48. The mail receipts cited by defendants show that the packages in question were ultimately delivered. *See* [80-14]. Armstrong didn't mail the documents to Stennis's home address. *See* [90] ¶ 6; [80-3] at 46–48.

4

the citations were nullified by the bankruptcy proceeding. [85] ¶ 7; [80-16]. The federal prosecutor responded that the citations were a criminal matter and were not a form of civil debt collection. [85] ¶ 8; [80-16]. The prosecutor wrote that if Stennis failed to appear in court pursuant to the second summons, a warrant would be issued for her arrest, and asked Stennis's attorney to tell his client about the summons. [85] ¶ 8; [80-16].

Stennis didn't appear, and a federal judge issued a warrant for her arrest. [85] ¶ 10; [80-17]. The warrant was to be executed by the Hines police so that Stennis could be brought before the court on the same day that the warrant was executed. [85] ¶ 10; [80-17].

On November 30, 2016, Hines police officers Armstrong and Amina Sahtout were assigned to arrest Stennis. [85] ¶ 11.[4] Armstrong went to Stennis's office and placed her under arrest. *See* [85] ¶ 12; [90] ¶ 7; [80-2] at 15–17; [80-1] at 38–39.[5] While the officers waited, Stennis called her bankruptcy attorney, and someone at that office emailed her a list of creditors. *See* [90] ¶ 7; [80-1] at 39; [85] ¶¶ 13–14.

---

[4] Stennis testified that Armstrong arrived alone in her office, *see* [80-1] at 38–39, but that doesn't controvert defendants' asserted fact: that both officers were assigned to the arrest. [85] ¶ 11. The fact is admitted.

[5] Armstrong told Stennis that he intended to take her to "federal prison." [90] ¶ 7; [80-1] at 39. There's a dispute as to whether Armstrong arrested Stennis on his own, or whether Sahtout was present in Stennis's office. *See* [90] ¶ 8; [85] ¶ 12; [80-1] at 38–39; [80-2] at 15–17. According to Stennis, she didn't know that she was going to be arrested until November 30. *See* [90] ¶ 7. But records cited by defendants—copies of the parking citations, emails between Stennis and Armstrong from September 2015, and Armstrong's testimony that he mailed copies of the summons to Stennis—show that she may have learned about the arrest before Armstrong arrived in her office. *See* [80-5]; [80-6]; [80-7]; [80-8]; [80-9]; [80-10]; [80-11]; [80-12]; [80-13]; [80-14]; [80-3] at 56. Stennis believed that Armstrong engineered her arrest as retaliation for her refusal to engage in fraud or theft. [90] ¶ 33.

Armstrong got mad and crumpled up the list of Stennis's creditors. *See* [90] ¶ 7; [80-1] at 38–39.[6] Accompanied by Armstrong (and possibly by Sahtout) Stennis walked to a room in the Hines police department. [90] ¶ 8. Armstrong printed out a paper, and then (with Stennis's colleagues and others watching) escorted Stennis to a police vehicle. *See id.*; [85] ¶ 14; [80-1] at 51; [80-2] at 20–21.

Before being restrained, Stennis told the officers that she had had cancer and breast surgery, and had breast implants. *See* [90] ¶ 9; [80-2] at 28–29 (According to Sahtout, Stennis said that she had had cancer and breast surgery.); [80-3] at 63–64 (Armstrong testified that Stennis told the officers about her breast implants, but didn't recall Stennis mentioning cancer or surgery.). Preparing to handcuff Stennis, one of the officers put Stennis's arms behind her back. *See* [90] ¶ 10.[7] Stennis yelled in pain and complained that it hurt. *Id*. The officers didn't seek medical care for Stennis, and instead handcuffed her (with hands behind her back) with two sets of cuffs. *See* [85] ¶¶ 15–16, 18; [90] ¶¶ 10, 13. The parties dispute how those handcuffs were applied: either one on top of the other or linked together. *See* [90] ¶ 13; [80-2] at 34. Stennis said that the second set of cuffs further restricted her movement. *See* [85] ¶ 17; [90] ¶ 13. Stennis felt that her implants were being damaged, but tried to deal with the pain because she was shameful of her mastectomy. [90] ¶ 14; [80-1] at 56–57.

---

[6] Sahtout's deposition testimony, cited by defendants, doesn't controvert plaintiff's asserted fact, which is admitted. *See* [80-2] at 17.

[7] There's a dispute as to which officer handcuffed Stennis. *See* [85] ¶ 15.

Stennis complained that the handcuffs were tight, and Sahtout asked Armstrong if they could handcuff Stennis in front of her body, rather than behind her back. *See* [85] ¶ 19; [90] ¶¶ 12, 14. Another officer was in the area, and Stennis asked him if he could intervene because she had had breast cancer surgery and her implant was in pain. *See* [90] ¶ 14; [80-1] at 57; [85-2] at 12. That officer told Armstrong that Stennis had had cancer surgery, that Stennis said the handcuffs were pulling on her surgically-repaired skin, and suggested handcuffing Stennis in front of her body so as to avoid putting stress on Stennis's chest. [90] ¶ 11; [85-2] at 21. Armstrong—who was serving as the Hines police department's liaison to the U.S. District Court for the Northern District of Illinois—said that Stennis couldn't be cuffed in front because the U.S. Marshals (who would handle custody at the federal courthouse) wouldn't take custody of prisoners who were restrained in that way. *See* [85] ¶ 19; [80-3] at 64–65.[8] Armstrong also said that it was his arrest, and that he would decide how to handcuff Stennis. [90] ¶ 11; [85-2] at 12.[9]

---

[8] Plaintiff's hearsay objection is overruled. The assertion at issue is what Armstrong said after Sahtout suggested front-cuffing Stennis, not what the U.S. Marshals told Armstrong about their detainee policy. *See* [85] ¶ 19. What Armstrong said—explaining his decision not to front-cuff Stennis in light of what he believed to be the U.S. Marshals' policy—isn't hearsay, because the assertion is a statement of Armstrong's then-existing state of mind. *See* Fed. R. Evid. 803(3). The statement of fact is relevant to the reasonableness of the defendant officers' use of force in detaining Stennis. *See* Fed. R. Evid. 401; *Day v. Wooten*, 947 F.3d 453, 460–64 (7th Cir. 2020).

[9] Hines police department guidelines said that handcuffs should be used on arrestees who were belligerent or threatening. [90] ¶ 15. While they were trained on how to use handcuffs in front of a detainee's body, Hines officers were generally instructed to restrain detainees behind their backs unless a detainee had a serious injury or disability. *See id.* ¶¶ 17–18 (Officers were trained to use discretion when choosing how to restrain injured or disabled detainees.). Armstrong was trained that the force applied during an arrest must be objectively reasonable based on the facts and circumstances. *Id.* ¶ 15. Stennis—arrested for

Armstrong and Sahtout placed Stennis in a police car, and Armstrong, who seemed angry, slammed the car door to prevent Stennis from speaking to the other officer. *See* [90] ¶ 14;[10] [85] ¶ 20. Sahtout, Armstrong, and Stennis drove an hour east from the hospital to the Everett M. Dirksen U.S. Courthouse. [85] ¶ 20. Stennis's handcuffs got tighter over the course of the drive. *See* [85] ¶ 21; [80-1] at 59. Stennis complained as soon as she got in the vehicle that she was uncomfortable, and every few minutes during the drive moaned in pain and said that she was hurting. [90] ¶ 19. Stennis had difficulty breathing, and told Sahtout that she couldn't breathe. *See* [85] ¶ 21; [90] ¶¶ 19–20; [80-1] at 59, 61–62.[11] Sahtout was sympathetic, but she and Armstrong didn't help Stennis or seek medical care for her. *See* [85] ¶ 21; [90] ¶¶ 20–21; [80-1] at 59.[12] At some point on the way to the courthouse, Stennis told the officers that she felt like she had torn something in her body. *See* [90] ¶ 20; [85] ¶ 21; [80-2] at 37–38, 41, 54–55; [85-6] at 2.

---

a petty offense—never resisted arrest, wasn't a physical threat, and wasn't a flight risk. *Id.* ¶ 16.

[10] Based on her close interactions with Armstrong, Stennis had personal knowledge to offer an opinion as to his state of mind during her arrest and detention. *See U.S. v. Curescu*, 674 F.3d 735, 740 (7th Cir. 2012) ("Rule 701(a) of the federal evidence rules allows a lay witness to offer an opinion that is 'rationally based on the witness's perception,' and though one can't actually read another person's mind, one is often able to infer, from what the person says or from the expression on his face or other body language, what he is thinking.").

[11] When Sahtout told Armstrong that Stennis couldn't breathe, he turned up the radio. [90] ¶ 20. The parties dispute why the radio was tuned up. According to Stennis, Armstrong wanted to tune her out. *See id.*; [80-1] at 62. Officer Sahtout said defendants were hoping the radio would help Stennis relax. *See* [90] ¶ 20; [80-2] at 37.

[12] There's a dispute as to whether the officers offered to take Stennis to a hospital. Stennis testified that the officers didn't make that offer. *See* [90] ¶ 21; [80-1] at 63–64. According to Armstrong and Sahtout, however, Armstrong told Stennis that if she was having a medical emergency they would pull the vehicle over and call an ambulance. *See* [90] ¶ 21; [80-3] at 72–73; [80-2] at 35–36.

The squad car arrived at the courthouse, and was met by officers of the U.S. Marshals Service. [85] ¶ 22. While Sahtout and Armstrong didn't tell the marshals about Stennis's complaints, *see* [90] ¶ 22, Stennis told the marshals that she was in pain, having trouble breathing, and that she believed there was something wrong with her breast implant. *See* [85] ¶ 23; [90] ¶¶ 23–24; [80-1] at 66–67 (Stennis told the officers that she had "messed something up inside of myself" and it's reasonable to infer that she was referring to her breast implant when she told officers that "I don't feel like it's supposed to feel.").[13] A marshal told Officer Sahtout to loosen Stennis's handcuffs, and someone released Stennis. [90] ¶ 23. Stennis felt that her implant would potentially rupture, because her skin was thin from radiation treatment. *Id.* ¶ 26. The officers decided that Stennis needed medical attention, and one of them called an ambulance. [85] ¶ 24; [90] ¶ 26.[14]

An ambulance arrived, and Stennis told paramedics that she wanted to go to Northwestern Memorial Hospital where she had received cancer care and her mastectomy surgeries. [85] ¶¶ 25, 27.[15] Sahtout accompanied Stennis (who wasn't handcuffed for this ride) to the hospital's emergency department. *Id.* ¶ 26; [90] ¶ 25.

---

[13] That Stennis had previously informed Armstrong and Sahtout of her breast cancer and surgery, yelled out in pain when she was handcuffed, and told the officers that she was in pain, couldn't breathe, and that she believed she had torn something doesn't controvert the fact asserted—that Stennis complained specifically of an injury to her breast implant caused by the handcuffs for the first time after the squad car arrived the garage at the federal courthouse. *See* [85] ¶ 23; [80-1] at 63; [80-2] at 28–29, 41–43; [80-3] at 63–64; [85-6] at 2.

[14] Stennis didn't know who called the ambulance. *See* [80-1] at 67, 71, 76–77. Stennis said that Armstrong looked mad when medical assistance was called. *See* [90] ¶ 26; *U.S. v. Curescu*, 674 F.3d 735, 740 (7th Cir. 2012).

[15] Armstrong suggested that Stennis be taken to Rush University Medical Center because it was closer than Northwestern. *See* [90] ¶ 27; [80-1] at 72.

9

In the ER, Stennis complained of pain in her chest and was seen by several doctors. *See* [85] ¶ 27; [85-5] at 34–37, 44–46. One doctor found after a physical examination that there was no evidence of acute injury, but diagnosed Stennis with a chest wall injury. *See* [85] ¶ 28; [90] ¶ 28; [85-5] at 35–37. Stennis told the doctor that her implant wasn't in the normal place. [90] ¶ 28. A radiologist recommended that Stennis undergo an ultrasound or mammography to check for damage to her breast implant, but the doctor didn't order either test. *Id.*; *see* [85-5] at 46. A plastic surgeon noted that Stennis's implant was out of place and tender. [90] ¶ 29.

Ten months later, Stennis visited a plastic surgeon. *See* [85-1] at 36. The surgeon noted that Stennis had been double-handcuffed and sustained trauma to her breasts and a rotated implant. *See* [90] ¶ 30; [85-1] at 52. The surgeon said that the rotation could have been caused by external force, but didn't conclusively link the arrest with harm to Stennis's implants. *See* [90] ¶¶ 30–31; [85-1] at 17–18, 35–37, 39, 52–56, 61. Stennis ultimately lost her right implant and required additional surgeries to replace it. [90] ¶ 32. The surgeon noted that—because of previous damage to the area—Stennis was approaching the point at which she couldn't receive another surgery. [90] ¶ 32.

## III.  Analysis

### A.  Availability of Relief Under *Bivens*

The Supreme Court has on three occasions created implied causes of action for damages against federal officials. Those claims related to (1) an unreasonable search and seizure during a warrantless arrest in violation of the Fourth Amendment, (2)

gender discrimination under the Fifth Amendment, and (3) deliberate indifference to medical needs under the Eighth Amendment. *See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 397 (1971); *Davis v. Passman*, 442 U.S. 228, 248–49 (1979); *Carlson v. Green*, 446 U.S. 14, 16–25 (1980). More recently, however, the Court has cautioned against further expansion of *Bivens* liability, and repeatedly declined to fashion more implied remedies for constitutional violations caused by federal officers. *See Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017) (gathering cases).

In deciding whether to recognize a *Bivens* claim, a court first asks if the claim arises in a new context, meaning that the case is meaningfully different from the three decisions where the Court has already recognized an implied cause of action. *See Egbert v. Boule*, 142 S. Ct. 1793, 1803 (2022) (citing *Ziglar*, 137 S. Ct. at 1859–60).[16] If a new context is present, the next step is to ask whether special factors counsel against creating an implied cause of action. *See id.* (citing *Ziglar*, 582 U.S. at 1858).[17] This two-step inquiry often boils down to a single question, however:

---

[16] A new *Bivens* context may exist because of (1) a new category of defendants; (2) the rank of the officers involved; (3) the constitutional right at issue; (4) the generality or specificity of the official action; (5) the extent of judicial guidance as to how officers should respond to the problem or emergency confronted; (6) the statutory or other legal mandate under which the officers were operating; (7) the risk of disruptive intrusion by the judiciary into the functioning of other branches; or (8) the presence of potential special factors that previous *Bivens* cases did not consider. *Egbert*, 142 S. Ct. at 1803 (quoting *Corr. Services Corp. v. Malesko*, 534 U.S. 61, 68 (2001)); *Ziglar*, 137 S. Ct. at 1859–60.

[17] Grounded in separation-of-powers principles, these special factors include: (1) areas where Congress has designed its regulatory authority in a guarded way; (2) cases that would call into question general policies; (3) uncertainty about the systemwide consequences; or (4) the existence of an alternative remedy through which plaintiffs can vindicate their rights. *See Ziglar*, 137 S. Ct. at 1858–61; *Hernandez v. Mesa*, 140 S. Ct. 735, 744 (2020); *Egbert*, 142 S. Ct. at 1803–04;

"whether there is any reason to think that Congress might be better equipped to create a damages remedy." *Id.*[18] If there is even a single, rational reason to think that Congress (rather than the court) should decide if a *Bivens* cause of action should proceed, the court may not recognize an implied remedy. *Id.* at 1803, 1805 (citing *Hernandez v. Mesa*, 140 S. Ct. 735, 743 (2020)).

Stennis's claim for inadequate medical care seeks damages for an alleged violation of her rights under the Fifth Amendment.[19] A right to medical treatment was at issue in *Carlson*, but the claim in that case was based on a prisoner's right to be free from cruel and unusual punishment under the Eighth Amendment, not (as here) a pretrial detainee's right to adequate medical care under the Fifth Amendment. *See Carlson v. Green*, 446 U.S. 14, 16–24 (1980); *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1864 (2017) ("The constitutional right is different here, since *Carlson* was predicated on the Eighth Amendment and this claim is predicated on the Fifth.").

---

[18] The context and special-factors analyses aren't entirely separate. When there are special factors present that previous *Bivens* cases didn't consider, a case presents a new context. *See Egbert*, 142 S. Ct. at 1803 (quoting *Ziglar*, 137 S. Ct. at 1860).

[19] The amended complaint alleges that the denial of medical care violated the Eighth and Fifth Amendments. [4] ¶ 46. Stennis was arrested pursuant to a warrant, *see* [85] ¶ 10; [80-17], which means that her claim against federal officers Armstrong and Sahtout for inattention to her medical needs likely arises under the Fifth Amendment. *See Sides v. City of Champaign*, 496 F.3d 820, 828 (7th Cir. 2007) (citing *Bell v. Wolfish*, 441 U.S. 520, 535–37 (1979)); *Villanova v. Abrams*, 972 F.2d 792, 797 (7th Cir. 1992) (citations omitted) ("[T]he Fourth Amendment governs the period of confinement between arrest without a warrant and the preliminary hearing at which a determination of probable cause is made, while due process regulates the period of confinement after the initial determination of probable cause."); *Pulera v. Sarzant*, 966 F.3d 540, 548–49 (7th Cir. 2020). Even if the Fourth Amendment continued to govern Stennis's pretrial release, *see Mitchell v. Doherty*, 37 F.4th 1277, 1282–86 (7th Cir. 2022) (discussing *Manuel v. City of Joliet*, 580 U.S. 357 (2017)), that wouldn't change the *Bivens* analysis. None of the existing *Bivens* cases dealt with a Fourth Amendment claim for inadequate medical care, which means that such a claim would also present a new context. *See Ziglar v. Abbasi*, 137 S. Ct. 1843, 1864 (2017).

Similarly, the context in this case is different from that at issue in *Davis* because that case involved a claim for sex discrimination, not an allegation of inadequate medical care. *See Davis v. Passman*, 442 U.S. 228, 235–36 (1979). Because it implicates a constitutional right that wasn't at issue in *Bivens*, *Carlson*, or *Davis*, Stennis's Fifth Amendment claim for inadequate medical care presents a new *Bivens* context. *See Ziglar*, 137 S. Ct. at 1864 ("[A] case can present a new context for *Bivens* purposes if it implicates a different constitutional right."); *see also Choice v. Michalak*, No. 21-cv-0060, 2022 WL 4079577, at *3–8 (N.D. Ill. Sept. 6, 2022).

Stennis's excessive force claim—arising under the Fourth Amendment[20]—is similar in some ways to the claims at issue in *Bivens* itself. *See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 389–90 (1971). In *Bivens*, the Court authorized suit against federal agents for violating the Fourth Amendment's prohibition against unreasonable searches and seizures. *See id.* at 396–97. This case—like *Bivens*—involves an allegation of excessive force. But similar allegations, even those that present "almost parallel circumstances," aren't enough to support the judicial creation of a cause of action. *Egbert v. Boule*, 142 S. Ct. 1793, 1805 (2022) (quoting *Ziglar*, 137 S. Ct. at 1859).

The presence of at least one special factor means that Stennis's Fourth Amendment claim arises in a new context, and weighs against recognizing either of

---

[20] The complaint alleges that the officers' excessive force violated the Eighth, Fourth, and Fifth Amendments. [4] ¶ 38. The Fourth Amendment governs the use of force applied during an arrest. *Gupta v. Melloh*, 19 F.4th 990, 995–96 (7th Cir. 2021) (citing *Graham v. Connor*, 490 U.S. 386, 394–95 (1989)).

Stennis's *Bivens* claims. Congress has already authorized remedial processes for Veterans Affairs employees like Stennis who were allegedly injured by fellow VA employees. For example, the VA has an administrative grievance process. *See* Department of Veterans Affairs, VA Directive 5021 at A-10a (Nov. 8, 2012); 38 U.S.C. §§ 501(a), 7421, 7461–64. The existence of this alternative remedy is enough to bar a *Bivens* action. *Egbert*, 142 S. Ct. at 1804 (citing *Ziglar*, 137 S. Ct. at 1858); *see Corr. Services Corp. v. Malesko*, 534 U.S. 61, 74 (2001). Stennis has also brought claims (as discussed below) under the Federal Tort Claims Act to redress the VA officers' conduct. *See* 28 U.S.C. § 2674. These alternative remedial processes demonstrate that Congress and the Executive are better equipped to create a damages remedy, and, as a result, the court cannot imply a cause of action against Armstrong and Sahtout. And even if these alternatives to *Bivens* weren't available to Stennis or against these particular defendants, their existence alone is enough to bar an implied cause of action. *See Egbert v. Boule*, 142 S Ct. 1793, 1806–07 (2022).[21]

---

[21] Stennis's Fourth Amendment claim also presents a new context because (1) the officers in this case were Veterans Affairs employees operating under a different legal mandate than was at issue in the three existing *Bivens* cases, and (2) Stennis was a federal employee arrested on federal property. *See Ziglar*, 137 S. Ct. at 1857, 1860 (a new context can exist when a new category of defendants is at issue or when officers operate under a different statutory or legal mandate); *Mejia v. Miller*, 53 F.4th 501, 506–07 (9th Cir. 2022) (suggesting that, after *Egbert*, a new context exists "even if only the officer's employing agency is different" or where the alleged violation occurred on federal land); *Bivens*, 403 U.S. at 389–90 (most of the alleged Fourth Amendment violations at issue in *Bivens* occurred in a home). That Stennis was arrested pursuant to a warrant and hasn't alleged that it was fraudulently procured, *see* [85] ¶ 10; [80-17], is yet another reason why her Fourth Amendment claim presents a new *Bivens* context. *Cf. Bivens*, 403 U.S. at 389–90 (*Bivens* involved a warrantless search and seizure.); *Greenpoint Tactical Income Fund LLC v. Pettigrew*, 38 F.4th 555, 563–64 (7th Cir. 2022) (suggesting in an alternative holding that federal officers could be sued under *Bivens* when they searched a home and other properties pursuant to a fabricated warrant affidavit).

14

Summary judgment is granted as to Stennis's Fourth and Fifth Amendment claims.

### B.     Excessive Force and Qualified Immunity

#### 1.     *Fourth Amendment*

Even if Stennis could sue Armstrong and Sahtout under the Fourth Amendment, she still could not recover for her injuries. Arresting officers violate the Fourth Amendment's prohibition on unreasonable seizures when they use excessive force. *See Weinmann v. McClone*, 787 F.3d 444, 448 (7th Cir. 2015) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). Whether a given use of force is excessive requires "a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). Courts consider the facts and circumstances of the case, including the severity of the crime at issue, whether the suspect posed a threat, and whether she was actively resisting or attempting to evade arrest. *Id.* (citation omitted). Force is excessive when it is greater than "reasonably necessary to make an arrest." *Day v. Wooten*, 947 F.3d 453, 460–61 (7th Cir. 2020). The use of force is evaluated from the perspective of a reasonable officer on the scene, and not with the clarity of hindsight. *Sow v. Fortville Police Dep't*, 636 F.3d 293, 303 (7th Cir. 2011) (citing *Graham*, 490 U.S. at 396).

An excessive-force claim may be based on the unreasonable infliction of pain through the use of handcuffs. *See Tibbs v. City of Chicago*, 469 F.3d 661, 666 (7th Cir. 2006); *Rooni v. Biser*, 742 F.3d 737, 742 (7th Cir. 2014) (citations omitted) ("A person

15

has the right to be free from an officer's knowing use of handcuffs in a way that would inflict unnecessary pain or injury, if that person presents little or no risk of flight or threat of injury."). For example, an excessive-force claim survived summary judgment in *Payne* when the evidence showed that (1) a detainee didn't resist arrest, disobey orders, pose a threat, and was suspected only of minor crimes; (2) was handcuffed so tightly that she lost feeling in her hands; (3) the defendant refused to loosen the cuffs when told of the numbness; (4) the defendant fought with other officers over the plaintiff's arm for half an hour and twisted her arm; and (5) the plaintiff later had two surgeries because of the handcuffing. *Payne v. Pauley*, 337 F.3d 767, 774–75, 779–81 (7th Cir. 2003). Similarly, defendants weren't entitled to summary judgment on an excessive-force claim based on tight handcuffs in *Herzog* when the officers (1) lacked probable cause for an arrest; (2) shoved a detainee to the ground when she wasn't resisting; (3) cracked the detainee's tooth while attempting to breathalyze her; (4) waited over an hour to loosen tight handcuffs; and (5) subjected her to unnecessary testing at a hospital. *Herzog v. Vill. of Winnetka*, 309 F.3d 1041, 1043–44 (7th Cir. 2002).

By contrast, the officer in *Tibbs* didn't violate a detainee's rights when the plaintiff complained once about his handcuffs and didn't elaborate on his injury, numbness, or degree of pain, was handcuffed for less than an hour, and wasn't seriously injured. *Tibbs v. City of Chicago*, 469 F.3d 661, 666 (2006). In *Day*, a detainee had difficulty breathing caused by tight handcuffs. *Day v. Wooten*, 947 F.3d 453, 462 (7th Cir. 2020). But because the detainee never connected the tightness of

his cuffs with his trouble breathing and the relationship between the two wasn't obvious, the detainee's Fourth Amendment rights weren't violated. *See id.* at 462–63 (citations omitted); *see also Stainback v. Dixon*, 569 F.3d 767, 773 (7th Cir. 2009) (citation omitted) ("[A] reasonable officer cannot be expected to accommodate an injury that is not apparent or that otherwise has not been made known to him.").

To prove a violation of her Fourth Amendment rights, Stennis must show that defendants knew the handcuffs were causing unnecessary pain or injury—knowledge that might be inferred from "multiple and specific complaints by the arrestee." *Day*, 947 F.3d at 462 (discussing *Rooni*, 742 F.3d at 742–43); *see also Stainback*, 569 F.3d at 773. While it can sometimes be clear from the act itself that a certain application of force will be excessive, *see Stainback*, 569 F.3d at 772, general complaints about pain, health conditions that aren't clearly related, or handcuff tightness aren't enough to put an officer on notice that the use of handcuffs will cause unnecessary pain or injury. *See Day*, 947 F.3d at 463–64 (citations omitted).

In this case, Armstrong and Sahtout had probable cause pursuant to a warrant to arrest Stennis, *see* [85] ¶ 10; [80-17], the authority to arrest necessarily includes the use of some degree of physical coercion, *see Sow v. Fortville Police Dep't*, 636 F.3d 293, 303 (7th Cir. 2011) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)), and Hines officers were generally instructed to handcuff detainees behind their backs. *See* [90] ¶¶ 17–18. But defendants arrested Stennis for a minor offense, and Stennis never resisted arrest, threatened the officers, or presented a flight risk. *See id.* ¶ 16. While disputed, it's reasonable to infer that the handcuff technique used on Stennis

17

was unusual, because she was double-cuffed, with the cuffs applied one on top of the other (rather than linked together, so as to extend the chain). *See* [85] ¶¶ 15–18; [90] ¶¶ 10, 13; [85-4] at 2 (Officers were trained to use a single set of cuffs on detainees). There's evidence that the effect of the second set of cuffs was to restrict Stennis further. *See* [90] ¶ 13; [80-1] at 55–56, 135–36; [85-2] at 33–34. The handcuffing in this case may have caused Stennis serious injury. *See* [85] ¶ 28; [90] ¶¶ 28–32.

Before she was handcuffed, Stennis told defendants that she had been diagnosed with cancer, had breast surgery, and had implants. *See* [90] ¶ 9; [80-2] at 28–29; [80-3] at 63–64. Stennis yelled out in pain when she was first handcuffed. *See* [90] ¶ 10. She then said that her breast implant was in pain, *see* [90] ¶ 14; [80-1] at 57, and another Hines officer told Armstrong that the cuffs were pulling on Stennis's surgically repaired skin. *See* [90] ¶ 11; [85-2] at 21. On the way to the courthouse, Stennis complained that the cuffs were tight, moaned in pain, told officers that she couldn't breathe, and said that she thought she had torn something in her body. *See* [90] ¶¶ 19–20; [85-2] at 41, 54–55; [85] ¶¶ 19, 21.

Stennis's complaints weren't always specific.[22] Considering the totality of the circumstances, however, a jury could conclude that reasonable officers in Armstrong's and Sahtout's position could have put two and two together, and have understood Stennis's complaints to relate to the specific medical issue that she and another other

---

[22] For instance, complaints that she had had cancer, surgery, and implants didn't necessarily alert reasonable officers that handcuffing Stennis behind her back would inflict unnecessary pain or injury. *See Day*, 947 F.3d at 463 (Officers couldn't have known that a detainee's trouble breathing was caused by handcuffs.); *Stainback*, 569 F.3d at 773 (It was not clear to officers that an arrestee's shoulder pain was related to a pre-existing shoulder injury exacerbated by being handcuffed behind his back.).

officer drew attention to: a preexisting injury to Stennis's chest. *See Day v. Wooten*, 947 F.3d 453, 462 (7th Cir. 2020) (discussing *Rooni v. Biser*, 742 F.3d 737, 742 (7th Cir. 2014)) (suggesting that multiple and specific complaints about the nature of pain or injury could be sufficient to put an officer on notice of unnecessary pain or injury). *Cf. Stainback v. Dixon*, 569 F.3d 767, 773 (7th Cir. 2009) (Officers acted reasonably when a detainee said that he believed he would be hurt if he were handcuffed and that handcuffing was causing him shoulder pain but didn't inform officers of any preexisting injuries.).[23] That Stennis was double-handcuffed in an unusual way also suggests that officers in defendants' position could have known that they were using excessive force.

The Fourth Amendment required these officers to avoid knowingly using handcuffs in a way that would inflict unnecessary pain or injury on a detainee like Stennis, who presented no risk of flight or threat of injury. *Stainback*, 569 F.3d at 772 (citing *Herzog v. Vill. of Winnetka, Ill.*, 309 F.3d 1041, 1043 (7th Cir. 2002)). On this record, reasonable officers could have known from the unusual handcuffing technique at issue, warnings about Stennis's past conditions, and Stennis's repeated complaints of pain that plaintiff had a condition that would be aggravated if she were handcuffed (or continued to be handcuffed). While a jury could conclude otherwise, a genuine material dispute remains as to whether these officers violated Stennis's Fourth Amendment rights.

---

[23] Officer Sahtout apparently credited Stennis's account enough to suggest an alternative arrangement. *See* [90] ¶ 12. That suggests that Sahtout may have actually been aware that the use of handcuffs on Stennis was causing plaintiff unnecessary pain or injury.

## 2. *Qualified Immunity*

Qualified immunity protects government officials from civil liability when their conduct doesn't violate a clearly established right. *Smith v. Finkley*, 10 F.4th 725, 737 (7th Cir. 2021) (citing *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014)). Once qualified immunity is raised, Stennis bears the burden of showing that Armstrong and Sahtout (1) violated a constitutional right and (2) that the right in question was clearly established at the time of the alleged violation. *See Fosnight v. Jones*, 41 F.4th 916, 924 (7th Cir. 2022) (citation omitted). As discussed above, there are enough factual disputes to put the excessive-force question—whether the officers violated the constitution—to a jury. But viewing the facts in Stennis's favor, the officers are nevertheless entitled to summary judgment at the second step of the qualified-immunity inquiry. To show that a Fourth Amendment right is clearly established, it must be defined more specifically than the general right to be free from unreasonable seizure, because it is sometimes difficult for an officer to see how the relevant rule applies to a given factual situation. *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (citation omitted). Clearly established doctrines place the constitutionality of conduct "beyond debate," and qualified immunity protects officers with the exception of "the plainly incompetent or those who knowingly violate the law." *District of Columbia v. Wesby*, 138 S Ct. 577, 589 (2018) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) and *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

The existing precedent in this area didn't place the lawfulness of Stennis's arrest beyond debate. *See Wesby*, 138 S Ct. at 590; *Kisela*, 138 S. Ct. at 1153 (quoting

20

*Mullenix v. Luna*, 137 S. Ct. 305, 309 (2015)) (noting that in the excessive force context "police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue"). *Payne* and *Herzog*—cases where tight handcuffs provided at least some basis for a finding of Fourth Amendment violations—involved significantly more and different uses of force than are at issue here. *See Payne v. Pauley*, 337 F.3d 767, 778–80 (7th Cir. 2003); *Herzog v. Vill. of Winnetka, Ill.*, 309 F.3d 1041, 1042–45 (7th Cir. 2002). The courts in *Rooni*, *Stainback*, and *Day* did not find a violation of the Fourth Amendment. *See Rooni v. Biser*, 742 F.3d 737, 742–43 (7th Cir. 2014); *Day v. Wooten*, 947 F.3d 453, 460–64 (7th Cir. 2020); *Stainback v. Dixon*, 569 F.3d 767, 771–73 (7th Cir. 2009). The *Stainback* court noted, in dicta, that had a detainee communicated to officers that he suffered from a preexisting injury that would be aggravated by handcuffing, the officers would have been obligated to consider that information in deciding whether to handcuff. 569 F.3d at 773. In *Rooni*, the detainee complained twice about tight handcuffs, which caused some visible damage to a detainee's wrists, yet the court found the violation possible, not definitive. 742 F.3d at 742–43. The *Day* court found that qualified immunity protected officers when a detainee didn't connect complaints about tight handcuffs to his difficulty breathing, and the court didn't elaborate on what was required to put an officer on notice that handcuffs would cause unnecessary pain or injury. 947 F.3d at 461–64.

It is difficult in close cases to say that a right to be free from a particular force was clearly established. *See Rooni*, 742 F.3d at 743. Here, Stennis cannot point to a

21

closely analogous case that would have put these officers on notice that their conduct violated the Fourth Amendment. *See Jump v. Vill. of Shorewood*, 42 F.4th 782, 792 (7th Cir. 2022). A case directly on point isn't required. *See Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 731 (7th Cir. 2013) (citations omitted). But Stennis needed to show "some settled authority" that would have shown a reasonable officer in defendants' position that their actions violated the Constitution. *Leiser v. Kloth*, 933 F.3d 696, 702 (7th Cir. 2019) (citing *Mullenix v. Luna*, 577 U.S. 7, 11–12 (2015)); *see Wesby*, 138 S. Ct. at 589. Stennis hasn't identified that authority, and this isn't the rare case when the violation was so patently obvious, egregious, and unreasonable as to do away with that requirement. *See Reed v. Palmer*, 906 F.3d 540, 547 (7th Cir. 2018) (citations omitted). The officers are entitled to qualified immunity from Stennis's Fourth Amendment claim.

### C.    FTCA Claims

The FTCA allows suit against the United States for injuries caused by the wrongful acts of federal employees acting within the scope of their employment under circumstances when a private person would be liable. *See* 28 U.S.C. § 2674; *Glade ex rel. Lundskow v. U.S.*, 692 F.3d 718, 721 (7th Cir. 2012). FTCA claims are governed by the law of the state where the alleged torts occurred. *See* 28 U.S.C. § 2674; *Glade*, 692 F.3d at 721. The alleged tortious acts in this case occurred in Illinois, and under Illinois law, a public entity like the United States cannot be held liable for an injury resulting from "an act or omission of its employee where the employee is not liable." 745 ILCS 10/2-109; *see Davis v. U.S.*, No. 92 C 3239, 1993 WL 410148, at *1–2 (N.D.

Ill. Oct. 14, 1993) (citing *Est. of Warner v. U.S.*, 743 F.Supp. 551, 553 (N.D. Ill. 1990)) (finding that the United States was equivalent to a "local public entity" under the Illinois Local Governmental and Governmental Employees Tort Immunity Act). Public employees in Illinois aren't liable for law enforcement actions unless their conduct was willful and wanton. 745 ILCS 10/2-202; *Munoz v. Nucor Steel Kankakee, Inc.*, 44 F.4th 595, 603 (7th Cir. 2022) (citations omitted) (Willful and wanton conduct must be either intentional or reckless, meaning committed with utter indifference to or conscious disregard for the safety of others).

Stennis brings four claims under the FTCA based on the torts of (1) intentional infliction of emotional distress; (2) abuse of process; (3) negligence; and (4) failure to supervise. [4] ¶¶ 56–74. The actions of officers Armstrong and Sahtout during the arrest are the basis for the intentional infliction of emotional distress and negligence claims. *See* [86] at 14–15. By sending arrest notices to the wrong address and ignoring her in-person visits, Stennis argues that Armstrong abused process, because those actions caused her to miss court appearances. *See id.* As for the final FTCA claim, the complaint says that the chief of police at Hines failed to adequately supervise or discipline his subordinates. *See* [4] ¶¶ 8, 69–74.

The United States moves for summary judgment on all of plaintiff's FTCA claims. [78] at 1. Defendant argues that it is entitled to summary judgment on Counts Four, Five, and Six because Stennis hasn't shown that Armstrong or Sahtout engaged in willful or wanton conduct. [79] at 13–15. Defendant made no argument as to why it is entitled to judgment on Count Seven (failure to supervise), never mentioned the

chief of police, and waived argument as to that claim. *See id.*; *Argyropoulos v. City of Alton*, 539 F.3d 724, 738 (7th Cir. 2008) (citations omitted).

On Counts Four and Six—intentional infliction of emotional distress and negligence—there's a dispute whether Armstrong and Sahtout acted in a willful and wanton way. As discussed above at 14–19, a jury could conclude that by double-handcuffing Stennis and failing to release her despite repeated complaints, these officers knowingly inflicted unnecessary pain or injury. Similarly, a genuine material dispute exists as to whether Armstrong and Sahtout acted with conscious disregard for Stennis's safety. *See* 745 ILCS 10/2-202; *Munoz v. Nucor Steel Kankakee, Inc.*, 44 F.4th 595, 603 (7th Cir. 2022). That these officers cannot be held liable for violations of Stennis's constitutional rights doesn't mean that the United States is entitled to summary judgment. Stennis's FTCA claims are based on tort theories of liability, and the United States never argued that Stennis could not carry her burden of proof as to the torts at issue. *See* [79] at 13–15; [89] at 12.

There's no evidence of willful and wanton conduct in relation to Count Five. In support of this claim, predicated on abuse of process, Stennis argues that by sending communications about her parking tickets to the wrong address and ignoring her in-person visits, Armstrong intended to harm her. *See* [86] at 14–15. But Armstrong followed Stennis's instructions in communicating with her by mail, [85] ¶¶ 3, 5; [80-3] at 46–48, tried to contact her by e-mail, [90] ¶ 5; [80-9], and nothing about Armstrong's communications about the tickets constituted willful and wanton conduct. *See Smith v. City of Chicago*, 242 F.3d 737, 744 (7th Cir. 2001).

24

Summary judgment is granted to the United States on Count Five, but not on Counts Four, Six, and Seven.

## IV. Conclusion

The motion for summary judgment, [78], is granted in part and denied in part. Summary judgment is granted to officers Armstrong and Sahtout, and to the United States on Count Five. The motion is denied as to Counts Four, Six, and Seven.

ENTER:

_____
Manish S. Shah
United States District Judge

Date: January 31, 2023

25